# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Deon S. Glenn, | ) | CASE NO. 4:18 CV 436 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Ohio Department of Rehabilitation and | ) | Memorandum of Opinion and Order |
| Correction, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 12) and Plaintiff's Motion for Summary Judgment (Doc. 13). This case arises under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). For the reasons that follow, defendants' motion is DENIED and plaintiff's motion is GRANTED. The Court hereby grants plaintiff's request for a declaration that the grooming policies as applied to him violate RLUIPA. Defendants are hereby enjoined from enforcing such policies against plaintiff only. The Court takes no position on whether the dreadlock ban is enforceable with respect to other inmates.

1

**FACTS**

Plaintiff, Deon S. Glenn, brings this action against defendants, Ohio Department of Rehabilitation and Correction ("ODRC") Director Gary C. Mohr and Trumbull Correctional Institution Warden Charmaine Bracy. Plaintiff alleges that the inmate grooming policy maintained by defendants, which prohibits dreadlocks, violates RLUIPA.

The facts of this case are largely undisputed. Plaintiff is incarcerated at Trumbull Correctional Institute ("TCI") where he is serving a lengthy sentence for murder and attempted murder. (ECF 12-1 at ¶ 5). Plaintiff is a "level 3" security risk, which corresponds to an inmate requiring "close security." (Id.) Since his incarceration at TCI, plaintiff has received 28 "cases," which resulted in guilty findings with respect to 39 rule violations. (ECF 12-1 at ¶ 6). Plaintiff received seven violations for possession of contraband and one "weapons" violation. *Id*.

Plaintiff is a practicing Rastafarian and has been since 2012. (ECF 13-6 at ¶ 2). One of the tenets of his faith includes the Nazarite vow, which prohibits the cutting of hair. According to his affidavit, Rastafarianism requires that "hair should grow and 'lock' naturally without being cut." (Id. at ¶ 4). Plaintiff's hair naturally grows in tight curls. As it gets longer, "the curls naturally coil together to form dreadlocks." (Id. at ¶ 5). Braids are not an acceptable alternative. (Id. at ¶ 22). Currently, plaintiff's dreadlocks are "thinner than a wooden pencil and only extend about three inches from [his] scalp.[1]" Id. at ¶ 23. He uses soap and water to keep his hair clean. (Id.).

Ohio Administrative Code § 5120-9-25(D) governs the appearance of male prisoners. It

---

[1] Plaintiff, however, does not seek to limit his hair to this status. Rather, he seeks to grow his dreadlocks to whatever length and thickness they naturally attain.

2

provides as follows:

> D) Haircuts shall be provided as needed. Hair shall be kept clean. Braids may be worn subject to the limitations of this rule. The following hairstyles or facial hair are not permitted: Initials, symbols, dyes, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness), weaves, and dreadlocks. Other hairstyles not specifically listed herein may be prohibited if they are determined to be either a threat to security or contrary to other legitimate penological concerns, as determined by the office of prisons. If approved by the warden, an inmate may wear a wig for medical reasons or in conjunction with medical treatment.

In addition to this policy, defendant does not dispute that a November 30, 2014 memorandum ("Memorandum") drafted by TCI regarding hair care provides that there are "no religious exemptions" for dreadlocks. The Memorandum further defines a dreadlock as "a narrow ropelike strand of hair formed by matting that cannot be taken down easily or combed/brushed through."

According to plaintiff, he wore his hair in dreadlocks without incident until September of 2016, at which point TCI informed him that he would be required to cut his dreadlocks. Plaintiff refused on the basis that cutting his hair violated his religion. Defendant then disciplined plaintiff, including placing him in "the Hole," where he was unable to sleep for several days in a row. Ultimately, plaintiff conceded to have his dreadlocks cut in order to avoid further discipline.

Thereafter, plaintiff filed this one count complaint alleging that the grooming policy violates RLUIPA. The parties cross-move for summary judgment and each opposes the other's motion.

**STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the

3

moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56©); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56©). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

4

does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## **ANALYSIS**

"Congress enacted RLUIPA...in order to provide very broad protection for religious liberty." *Holt v. Hobbs*, 135 S.Ct. 853 (2015)(citations and quotations omitted). RLUIPA provides, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA employs a burden shifting analysis. Plaintiff bears the initial burden of establishing that the grooming policy implicates his religious exercise. *Id.* at 862. Plaintiff must further show that grooming policy substantially burdens this exercise. *Id.* In the event plaintiff is able to meet these initial burdens, the burden shifts to the government to show that its refusal to allow plaintiff to maintain his hairstyle furthers a "compelling governmental interest" and is the "least restrictive means" of furthering such interest. *Id.*

The Supreme Court held that RLUIPA "contemplates a...focused inquiry and requires the Government to demonstrate that the compelling test is satisfied through application of the

5

challenged law 'to the person'–the particular claimant whose sincere exercise of religion is being substantially burdened." *Id*. at 863. The statute further requires courts to "scrutinize the asserted harm of granting *specific exemptions to particular religious claimants* and to look to the marginal interest in enforcing the challenged government action in that particular context." *Id*. (Emphasis added)(citations and quotations omitted).

Here, the Court finds that plaintiff satisfies his burden of demonstrating that the "anti-dreadlock" policy implicates his religious exercise. To satisfy this test, plaintiff must show that plaintiff's dreadlocks are the result of a "sincerely held religious belief." Plaintiff offers his own affidavit in which he avers that he is a practicing Rastafarian and has been since 2012. One of the tenets of his faith includes the Nazarite vow, which prohibits the cutting of hair. According to his affidavit, Rastafarianism requires that "hair should grow and 'lock' naturally without being cut." Plaintiff's hair naturally grows in tight curls. In addition, plaintiff indicates that his dreadlocks are an outward expression of his beliefs and carry a religious significance. In response, defendants argue that the biblical passage cited by plaintiff in his brief does not specifically require locked hair. Rather, it requires only that a follower maintain the length of his hair. Defendants' policy, however, does not require that plaintiff cut his hair. In other words, defendants argue that plaintiff's desire to maintain "locked" hair does not stem from a sincerely held religious belief. The Court rejects this argument. Plaintiff's belief that Rastafarianism requires dreadlocks is well-supported both by his detailed affidavit on the subject, as well as at least one bible verse he quotes. Defendants' cite no evidence to the contrary.[2] The Court finds

---

[2] "Congress defined religious exercise...to include any exercise of religion, whether or not compelled by, or central to, a system of religious beliefs." *Holt v. Hobbs*, 135 S.Ct. 853, 860

no genuine issue of material fact on this issue.

The Court further finds that defendants' grooming policy substantially burdens plaintiff's religious exercise. Plaintiff indicates that he was required to choose between cutting (or removing) his dreadlocks and, because he refused, he was subjected to significant discipline. This is sufficient to satisfy plaintiff's burden. *See, Holt*, 135 S.Ct. at 862 ("[I]f petitioner...grows his beard, he will fact serious disciplinary action. Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise.").

Thus, this Court must determine whether the grooming policy as applied to the plaintiff in this case furthers a compelling governmental interest. If defendants are able to establish that the policy serves a compelling governmental interest, the Court must determine whether the grooming policy as applied to plaintiff is the least restrictive means of enforcing the compelling interest.

> The least-restrictive means standard is exceptionally demanding and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it.

*Holt,* 135 S.Ct. at 864. (citations and quotations omitted). The government bears the burden of proof on this issue. The Court may consider the policies of other prisons in assessing whether the challenged policy satisfies the least restrictive means standard. *Holt,* 135 S.Ct. at 866. Although not controlling, the policies that other well-run institutions employ are relevant in determining the need for a particular restriction. Although RLUIPA does not "require that a prison grant a particular religious exemption as soon as a few other jurisdictions do so," it does require that a

---

(2015)(internal quotations omitted).

7

prison adequately explain why it "believes that it must take a different course" than other institutions have taken. *Id*.

Assuming *arguendo* that the policy at issue serves the compelling governmental interest of prison safety and security,[3] the Court finds that defendants fail, as a matter of law, to demonstrate that the policies at issue are the least restrictive means of furthering that interest. In support of their position, defendants offer testimony from the Managing Director of Operations for ODRC. He avers as follows:

- Staff cannot conduct a thorough search of an inmate's dreadlocks by simply having the inmate run his fingers through his own hair because "it is impossible to see or feel inside matted coils or knotted ropes of hair" once hair has become locked;

- Requiring staff to conduct personal searches of dreadlocks increases the risk of inmate-on-staff assault and increases tension between inmates and staff;

- Staff dreadlock inspections expose staff to the risk of being cut by sharp objects concealed in hair;

- Metal detector searches of dreadlocks will not identify the presence of plastic weapons or escape tools; nor will they detect contraband such as money or drugs;

---

[3] Although defendants argue in passing that the dreadlock ban also furthers their compelling interests in hygiene and preventing disguise in the event of escape, the Court finds that defendants fail to establish that no genuine issue of material fact exists with respect to these interests. Defendants simply fail to develop the record sufficiently to allow the Court to find in defendants' favor as a matter of law. Moreover, defendants fail to establish that they lack less restrictive means for achieving these goals.

8

- Emergency transports increase the aforementioned risks because hair cannot be quickly searched.

Giving defendants every benefit of the doubt, a careful review of this testimony demonstrates that inmate and metal detector searches are not feasible means of searching dreadlocks because these methods do not detect the presence of contraband. Therefore, this evidence supports defendants' position that a wholesale ban on dreadlocks is the "least restrictive means." With regard to staff searches of inmates' hair, however, the affidavit simply avers that risks are "increased." Standing alone, this evidence does not speak to whether defendants' anti-dreadlock policy is the least restrictive means. It simply notes that allowing dreadlocks increases the risk associated with conducting staff searches of inmates' dreadlocks. There is no indication, however, that staff searches of hair increase risk more than staff searches of other parts of the prisoner's body.

Because the evidence speaks only of the risk in general terms, the Court will look to the policies employed in other jurisdictions to determine whether those jurisdictions are able to manage that risk.[4] If so, these policies are strong evidence that Ohio's wholesale ban on

---

[4] The Court is aware of the Sixth Circuit's decision in *Hoevenaar v. Lazaroff*, 422 F.3d. 366 (6 th Cir. 2006), which reversed the district court on the basis that it failed to give sufficient deference to prison officials. Later, however, in *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), the Sixth Circuit reversed the district court for deferring to the prison officials in light of the fact that the officials did not consider the policies from other jurisdictions. In light of *Holt*, it is not clear what level of deference courts must afford in applying RLUIPA's "exceptionally demanding" least restrictive means test. What is clear from *Holt* and *Haight*, however, is that the policies of other prisons are relevant to the least restrictive means analysis and, if "so many" prisons are able to manage the security concerns associated with accommodating religious

9

dreadlocks is not the least restrictive means of ensuring prison safety and security. According to plaintiff, the majority of jurisdictions do not ban dreadlocks at all, let alone for all purposes.

Before comparing defendants' policies to those of other jurisdictions, the Court must first determine precisely what types of hairstyles Ohio bans. Defendants claim for the first time during litigation that their policies ban only hair that "has become so matted and interlocked that it cannot be undone and quickly or thoroughly searched." (Doc. 14 at p.3). Simply put, this narrower definition of "dreadlocks" appears nowhere in any ODRC or TCI policy. To the contrary, the ODRC policy expressly prohibits all dreadlocks. The TCI policy prohibits "narrow ropelike strand[s] of hair formed by matting that cannot be taken down easily or combed/brushed through.[5]" And, in the affidavit provided by defendants in support of their briefing, defendants indicate that dreadlocks are "interlocked coils of hair." (Doc. 12-1 at ¶ 10). Neither the policies nor the affidavit speaks to the searchability of the hair.[6]

---

requests, the defendant must be able to demonstrate why its prison is different. For similar reasons, the Court does not find persuasive the pre-*Holt* district court cases upholding dreadlock bans on which defendants rely.

[5] Defendants argue that the Court cannot consider the Memorandum because TCI drafted it more than two years ago and, as such, a Section 1983 claim would be barred by the statute of limitations. As plaintiff points out, however, no such claim is pending in this case. Moreover, there is no indication that this policy is not currently in effect. Accordingly, the Court will apply TCI's interpretation of ODRC policy in its entirety in assessing plaintiff's RLUIPA claim.

[6] Defendants' affidavit provides that dreadlocks may be formed by making braids, which are permitted, provided the braids "remain unlocked, can be undone, and can be quickly and thoroughly searched."

10

Furthermore, there is no indication that the narrower definition defendants now offer is the definition that Ms. Fisher, a cosmetologist, applied in determining that plaintiff's hair did not comply with OAC § 5120-9-25(D). (Doc. 13-6 at ¶7). Nor is it clear which definition defendants relied on in determining that plaintiff is in violation of the grooming regulations. Accordingly, defendants' argument that only "unsearchable" dreadlocks are prohibited is simply a post hoc rationalization made in an effort to narrow defendants' policies. Such actions, however, are disfavored in this Circuit, specifically in the context of RLUIPA. *See, Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014). Moreover, defendants present absolutely no evidence suggesting that plaintiff's hair "has become so matted and interlocked that it cannot be undone and quickly or thoroughly searched." Thus, even if this post hoc definition applied, there is nothing to suggest that plaintiff's hair meets this definition, as opposed to a generic dictionary definition of "dreadlock." Because ODRC's policy expressly prohibits all "dreadlocks," the Court will look to whether other jurisdictions impose a complete ban in order to ensure prison safety and security.

The Fifth Circuit recently addressed a case involving a prohibition on dreadlocks. In *Ware v. Louisiana Dep't of Corrections*, 866 F.3d 163 (5th Cir. 2017), the court determined that the grooming policy, which prohibited dreadlocks, was not the "least restrictive means" of achieving its stated objective. At trial, the plaintiff introduced evidence that 39 other jurisdictions, including the U.S. Bureau of Prisons, would either outright allow dreadlocks or afford plaintiff the opportunity to apply for a religious accommodation. Only six jurisdictions would not permit dreadlocks under any circumstance. The court noted that the defendant failed to offer sufficient evidence indicating that it was in a "unique" position compared to the vast

11

majority of jurisdictions that either allowed dreadlocks or offered a procedure for obtaining a religious accommodation. In all, the defendant failed to offer persuasive reasons why it believed that it had to take a course different than "so many prisons." As such, defendant's policy was not the least restrictive means. Ultimately, the court of appeals entered judgment in favor of plaintiff.

Upon review, the Court finds this case to be virtually indistinguishable from *Ware*. Although defendants point out that certain policies relied on by the *Ware* court are in actuality less restrictive than the court indicated, the fact remains that the vast majority of policies are in fact less restrictive that the ones at issue in *this* case. Some states expressly allow dreadlocks, *i.e.*, California, New York, and Oregon. Defendants argue that those polices, however, would not allow "unsearchable hair." Maybe so. But, again, Ohio's policy is not written in those terms. By way of example, New York's policy provides as follows:

> The dreadlock hairstyle is allowed. When worn, dreadlocks must extend naturally from the scalp and may not be woven, twisted, or braided together forming pockets than cannot be effectively searched.

Thus, New York's policy allows dreadlocks provided the hair has not become "woven, twisted, or braided together forming pockets that cannot be effectively searched." Generally speaking, dreadlocks are allowed with certain exceptions. Although New York may prohibit certain types of dreadlocks, its policies do not amount to a wholesale dreadlock ban.

Defendants correctly note that a handful of policies ban dreadlocks under all circumstances. The vast majority of policies, however, do not expressly address dreadlocks at all. Rather, those policies permit freedom in hairstyle provided hygiene and/or security concerns

12

are met. Some are understandably directed at searchability.[7] Nothing on the face of those policies, however, indicates that these prisons would ban all dreadlocks. Defendants argue that these polices "generally" reserve the right of the prison to prohibit "unsearchable" hair. But this is precisely the reason they are less restrictive. Pursuant to these policies, some dreadlocks may pass muster while others may not. *See, Holmes v. Engleson*, 2017 WL 3421499 (N.D. Ill. Aug. 9, 2017)(noting that policy allowing freedom in hair length provided hair does not create a security risk resulted in prison with some inmates wearing dreadlocks while those whose dreadlocks posed a security risk could not). Regardless, the policies require the prison to analyze each prisoner to determine whether a particular hairstyle is allowed. There is no indication that defendants conducted any particularized inquiry in this matter. This is so because ODRC's policy bans all dreadlocks and TCI's policy expressly prohibits inmates from applying for a religious exemption. As such, while the Court acknowledges that all states have security interests in the searchability of inmates' hair, the Court wholly agrees with the *Ware* court's conclusion that the vast majority of states have less restrictive means of enforcing those interests. There is simply no evidence that any defendant concluded that plaintiff's hair is not capable of being searched or otherwise creates a risk to prison safety or security. In fact, there is no

---

[7] Defendants note in their brief in opposition that "at least 31 jurisdictions prohibit inmates from wearing hair styles that are not searchable regardless of the inmate's religious beliefs." This may be true and the Court is by no means suggesting that a prison must allow "unsearchable hair" as a religious accommodation. Defendants' logic, however, is misguided because ODRC's policy is not directed at searchability. Rather, it simply prohibits all "dreadlocks." Defendants offer no evidence that all of these jurisdictions would consider each and every prisoner wearing dreadlocks to have "unsearchable" hair. And, on the face of the policies, these jurisdictions do no such thing.

indication that any employee even conducted any such assessment before determining that plaintiff cannot wear the hairstyle he seeks.[8] Thus, the majority of the policies relied on by defendants are not helpful because they require prison staff to assess a *particular* inmate's hair and are, therefore, less restrictive means.

Defendants argue that their policies are functionally no different because they simply "pre-identify" hairstyles that cause security risks. This Court disagrees. Once again, the Court notes that defendants' current definition, *i.e.*, "hair that has become so matted and interlocked that it cannot be undone and quickly or thoroughly searched," is *not* the definition set forth in the policies. Rather, the ODRC ban applies simply to "dreadlocks." Thus, the Court cannot say that ODRC's policy is "functionally equivalent" to those of states maintaining general grooming policies subject to hygiene and security concerns. Even TCI's arguably narrower definition, *i.e.*, narrow ropelike strand[s] of hair formed by matting that cannot be taken down easily or combed/brushed through," is not directed at searchability and expressly prevents a prisoner from applying for a religious exemption. Defendants' policies are undoubtedly more restrictive than the majority of the policies from the jurisdictions that address hairstyle and security on a case-by-case basis.

The Court is mindful of the difficulties faced by prison staff and is aware that prisons are unique institutions with serious safety concerns. Nor does the Court mean to suggest that defendants cannot ban unsearchable hair. The problem defendants now face, however, is that the

---

[8] Defendants note that plaintiff is the subject of a number of contraband violations and one weapons violation. Defendants do not suggest, however, that they considered these facts in denying plaintiff the ability to wear dreadlocks.

14

policies before the Court are not so drafted. These policies are much more restrictive than those of the vast majority of other states. And "in the face of evidence that many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes it must take a different course." Ohio has not done so in this case.[9] As such, the Court finds that because the vast majority of jurisdictions are able to manage the risk associated with dreadlocks short of a complete ban, defendants' policies as applied to plaintiff are not the least restrictive means as a matter of law.

Therefore, the Court concludes that plaintiff is entitled to judgment in his favor. The Court hereby grants plaintiff's request for a declaration that the grooming policies as applied to him, violate RLUIPA. Defendants are hereby enjoined from enforcing such policies against plaintiff.[10]

The Court, however, declines plaintiff's request to grant relief to prisoners not before this Court. Plaintiff filed this statutory claim on behalf of himself alone. In analyzing RLUIPA claims, this Court must conduct an individualized inquiry and assess whether defendants'

---

[9] Defendants provide evidence that, at one unidentified point in time, a shank was discovered in a prisoner's dreadlocks. As defendants' own citations point out, however, contraband has been located in dreadlocks and/or hair in other jurisdictions as well. Therefore, this one isolated incident does not make Ohio unique.

[10] In addition to demonstrating success on the merits, the Court finds that plaintiff demonstrates that he has no adequate remedy at law in that defendants' policies create an undue burden on his religious freedom. In addition, the Court finds that the public interest is served by enforcing the rights afforded under RLUIPA. An undue hardship on defendants will not be created because less restrictive means are available for enforcing their interest in maintaining prison security.

15

application of the grooming policies *to plaintiff* furthers a compelling governmental interest and is the least restrictive means of furthering that interest. *See, e.g., Holt*, 135 S.Ct. 853, 863 (2015)(RLUIPA requires a "more focused" inquiry and courts must look to whether it is proper to grant a religious exemption in the "particular context"); *Smith v. Owens*, 848 F.3d 975 (11 th Cir. 2017)("*Holt* calls for an individualized, context-specific inquiry."). As such, the Court cannot grant relief with respect to claimants not before it.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 12) is DENIED and Plaintiff's Motion for Summary Judgment (Doc. 13) is GRANTED. The Court hereby grants plaintiff's request for a declaration that the grooming policies as applied to him, violate RLUIPA. Defendants are hereby enjoined from enforcing such policies against plaintiff only. The Court takes no position on whether the dreadlock ban is enforceable with respect to other inmates.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Date: May 14, 2018